## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SPRINT CORPORATION,

     *Plaintiff*,

   v.

DEPARTMENT OF THE INTERIOR *et al.*,

     *Defendants*.

Civil Action No. 16-1972 (TJK)

## <u>MEMORANDUM OPINION</u>

Scattered across the United States, telecommunications sites support the ubiquitous phone and internet services on which customers increasingly rely. Crown Castle GT Company, LLC ("Crown") operates a telecommunications site in New Mexico, on federal land managed by Defendant Bureau of Land Management (BLM). In 2003, Alamosa Properties LP ("Alamosa")—a subsidiary of Plaintiff Sprint Corporation (together with Alamosa, "Sprint")— entered into a sublease with Crown that permitted it to place antennas on Crown's existing cellular tower and designated a lease area upon which Sprint planned to install items known as cellular cabinets. A few years later, BLM promulgated a regulation requiring any subtenant on a telecommunications site that owns an "equipment shelter" present there to obtain a separate BLM authorization for it and pay a related fee.

This case concerns BLM's subsequent application of this regulation and the relevant authorizing statute to Sprint's cellular cabinets. In 2013, BLM initiated a trespass action against Sprint, assessing penalties against it for failing to obtain a BLM authorization for its cellular cabinets, on the theory that the cabinets qualified as "equipment shelters" under the regulation. Sprint appealed this determination to the Interior Board of Land Appeals (IBLA or "Board"), arguing that it did not trespass and that, even if it did, BLM lacked statutory authority to impose

the penalties in question. The IBLA largely sided with BLM. Through this action, Sprint appeals the IBLA's ruling.

Before the Court are the parties' cross-motions for summary judgment. For the reasons explained below, the Court concludes that (1) the IBLA's determination that Sprint trespassed on public land because its cellular cabinets qualified as equipment shelters under the relevant regulation was not arbitrary and capricious, and (2) the IBLA's assessment of penalties against Sprint for its failure to obtain a right-of-way authorization for the cellular cabinets did not exceed its statutory authority. Therefore, the Court will deny Sprint's Motion for Summary Judgment (ECF No. 23) and grant Defendants' Cross-Motion for Summary Judgment (ECF No. 24).[1]

## I.  Background

### A.  Statutory and Regulatory Background

BLM, an agency of Defendant Department of the Interior, is responsible for managing public lands. The Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. § 1701 *et seq.*, governs its management of those lands. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 58 (2004). The statute authorizes BLM to grant rights-of-way on public lands for telecommunications purposes. *See* 43 U.S.C. § 1761(a)(5). These "[r]ights-of-way shall be granted, issued, or renewed . . . consistent with . . . any . . . applicable law" and "shall also be subject to such terms and conditions as the Secretary concerned may prescribe regarding extent, duration, survey, location, construction, maintenance, transfer or assignment, and termination."

---

[1] In evaluating these motions, the Court considered all relevant filings including, but not limited to, the following: ECF No. 1 ("Compl."); ECF No. 16; ECF No. 23 at 1–2; *id.* at 4–32 ("Pl.'s MSJ Br."); ECF No. 24; ECF No. 24-1 ("Defs.' MSJ Br."); ECF No. 25 ("Pl.'s Reply"); ECF No. 27 ("Defs.' Reply"); ECF No. 28-1 (Joint Appendix, with citations designated as "AR __"). The transcript from the oral argument is cited as "Oral Arg. Tr."

*Id.* § 1764(c). The FLPMA provides that, when BLM grants a right-of-way, "[t]he holder of a right-of-way shall pay in advance the fair market value thereof, as determined by the Secretary granting, issuing, or renewing such right-of-way." *Id.* § 1764(g).

BLM regulations provide that users of public lands "must have a grant under this part when [they] plan to use public lands for systems or facilities over, under, on, or through public lands." 43 C.F.R. § 2801.9(a). A "facility" is defined as "an improvement or structure, whether existing or planned, that is or would be owned and controlled by the grant or lease holder within a right-of-way." *Id.* § 2801.5. In the telecommunications context, a "facility means the building, tower, and related incidental structures or improvements authorized under the terms of the grant or lease." *Id.* BLM regulations also provided that "the holder of a right-of-way grant for communication purposes may authorize other parties to use a facility, without prior written consent of the authorized officer, if so provided by terms and conditions of the grant." 43 C.F.R. § 2801.1-1(f) (1996).

In June 2005, BLM promulgated a regulation (the "2005 Regulation") that included new subsections (b) and (c) below:

> If I am a tenant or customer in a facility, must I have my own grant or lease and if so, how will this affect my rent?
>
> (a) You may have your own authorization, but BLM does not require a separate grant or lease for tenants and customers using a facility authorized by a BLM grant or lease that contains a subleasing provision. BLM charges the facility owner or facility manager rent based on the highest value use within the facility (including any tenant or customer use authorized by a separate grant or lease) and 25 percent of the rent from the rent schedule for each of the other uses subject to rent (including any tenant or customer use a separate grant or lease authorizes and the facility owner's use if it is not the highest value use).
>
> (b) If you own a building, equipment shelter, or tower on public lands for communication purposes, you must have an authorization

under this part, even if you are also a tenant or customer in someone else's facility.

(c) BLM will charge tenants and customers who hold their own grant or lease in a facility, as grant or lease holders, the full annual rent for their use based on the BLM communication use rent schedule. BLM will also include such tenant or customer use in calculating the rent the facility owner or facility manager must pay.

43 C.F.R. § 2806.36. In the Federal Register, BLM explained that "[w]e added a new paragraph (b) to this section to make it clear that when someone owns a building, equipment shelter, or tower on public lands for communication purposes, they must have a BLM right-of-way authorization for their improvements, even if they are a tenant or customer in someone else's facility." Rights-of-Way, Principles and Procedures; Rights-of-Way Under the Federal Land Policy and Management Act and the Mineral Leasing Act, 70 Fed. Reg. 20,970, 21,015 (Apr. 22, 2005). According to BLM, the new subsection (b) was "consistent with current [BLM] policy" at the time and was designed to "eliminate confusion among some right-of-way holders." Id.

### B. Factual and Procedural Background

#### 1. The Orogrande Communications Site

The Orogrande Communications Site (the "Site") is located in south-central New Mexico. Pl.'s MSJ Br. at 1. In 1990, BLM issued "communications right-of-way grant/temporary use permit" number 83847 for the Site. Id. at 4; AR 59–60. The right-of-way granted the "right to construct, operate, maintain, and terminate a communication site and access road" and to place "[c]ellular mobile and portable communications" equipment on the Site. AR 59–60. In particular, the original right-of-way permitted the holder to place a 125-foot self-supporting steel monopole microwave antenna, a 12-foot high equipment building, a generator, a fuel tank, an access road, and a fence encumbering 3,250 square feet of public lands on the Site. AR 24, 35, 59–60, 490–91. The holder agreed to pay BLM "fair market value" for the right-of-

way. AR 60. The right-of-way provided that "[i]f renewed, the right-of-way permit shall be subject to the regulations existing at the time of renewal." AR 59.

In 2000, Crown acquired the right-of-way via assignment. AR 327–28, 338–39. BLM approved the assignment "subject to the terms and conditions of the original [right-of-way (ROW)] grant." AR 354. The assignment "cover[ed] the right to construct, operate, maintain, and terminate a communication site and access road" at the Site. AR 355. The right-of-way did not authorize subleasing without advance notice to and approval by BLM. AR 500. After acquiring the assignment, Crown requested authorization to enter into subleases with tenants at the Site. In January 2001, BLM granted Crown authority to sublease "subject to the terms and conditions of the original ROW grant" and "[a]ll applicable regulations in 43 CFR 2800." AR 371. That same month, BLM also granted Crown approval to amend the original right-of-way to install a 140-foot self-supporting tower. AR 366.

In January 2003, Crown entered into a sublease (the "Sublease") with Sprint for its tenancy at the Site. AR 962–1024. The Sublease's terms, conditions, and covenants were "subject to and subordinate to" the terms, conditions, and covenants of Crown's right-of-way, also referred to as the "Prime Lease." AR 967. The Sublease authorized Sprint to install four 60-inch by 12-inch by 7-inch antennas weighing 27 pounds each on Crown's tower, at a specified height. AR 962. The Sublease also designated a "lease area" of 17 feet by 12 feet by 10 feet for Sprint, referred to as "[e]quipment building/floor space." AR 962; *see also* AR 997 (showing the "[p]roposed . . . lease area"). The Sublease required Sprint to use the Site "in compliance with all applicable . . . regulations . . . of any governmental bodies and administrative agencies" and "obtain, at its own expense, any and all necessary licenses or permits . . . from such governmental authorities as shall have jurisdiction in connection with the construction,

installation, operation, repair, alteration or replacement of [its] equipment or with any of its activities thereon." AR 965. The Sublease provided that Sprint would pay Crown a "Basic Monthly Payment" (starting at $1,500/month) and "Additional Payments" for the "portion, if any, of any tax, fee or other assessment attributable to [Sprint's] use of the Facility or against the Facility generally . . . ." AR 963. After the Sublease was executed, Sprint installed its antennas on the tower and its cellular cabinets at the Site. Pl.'s MSJ Br. at 5; Compl. ¶ 3. Pursuant to the lease between BLM and Crown, Crown submitted rental calculation spreadsheets to BLM between 2003 and 2013 that listed tenants at the Site, including Sprint.[2] Pl.'s MSJ Br. at 8 (citing AR 403, 405, 410, 446, 517, 527, 592, 597, 602, 605, 607). However, Sprint did not seek authorization from BLM for its cellular cabinets, either before or after the 2005 Regulation was promulgated.

### 2. BLM's Management of the Site and Sprint's Alleged Trespass

As the manager of the federal public lands, BLM periodically inspected the Site. In March 2005, a BLM employee performed a compliance check at the Site and documented Sprint's cellular cabinets. *See* AR 430 (noting one "outside cabinet not on lease, possibly owned by Alamosa and/or Sprint"). He recommended that BLM "[i]ssue [a] separate lease to [the] owner of [the] outside cabinet." *Id.*

In 2008, BLM also issued a guidance document for the Site called the Orogrande Communications Site Plan (the "2008 Site Plan"). *See* AR 541–91. The 2008 Site Plan "govern[ed] development and management of" the Site, AR 544, and was "incorporated into all leases, grants, and reservations issued" for the Site, AR 547. It included pictures of Sprint's cellular cabinets and labeled them on a diagram of the Site. AR 568, 590. But an appendix to

---

[2] Crown's Prime Lease was renewed with BLM in December 2005. AR 486.

the 2008 Site Plan listed the cabinets as a "facility" without an authorization number. *See* AR

570 (showing "Auth # NMNM xxxxxx" for "South Facility #4 Alamosa (Sprint)"). The 2008

Site Plan also contained provisions addressing tenants' rights to build equipment shelters.

Specifically, it provided that "[t]enants . . . may not construct their own equipment shelter

(building, shelter or cabinet) . . . [and] [i]f that is not possible, a separate . . . application . . . and

authorization are required." AR 548. The 2008 Site Plan further provided that if a tenant had to

construct its own equipment shelter, it is "a tenant/customer of the original lease/holder in

addition[] to being a separate facility for billing purposes." *Id.*

In 2009, BLM personnel again noted the presence of potentially unauthorized cabinets on

the Site. *See* AR 600 (containing note to "check if authorized," in reference to the cabinets).

In April 2013, a BLM employee conducted an audit of the Site. AR 648. He determined

that Sprint had placed unauthorized cellular cabinets on the Site. Pl.'s MSJ Br. at 9 (citing AR

638–47). As a result, BLM issued a trespass notice ("the Trespass Notice") to Sprint on May 29,

2013. AR 655–58. The Trespass Notice stated that BLM had discovered equipment operating at

the Site that it believed belonged to Sprint. AR 655. On July 2, 2013, Sprint responded to the

Trespass Notice, making the case that it was not trespassing because it was occupying the Site

pursuant to its Sublease with Crown. AR 659–61. On July 23, 2013, BLM issued a trespass

decision (the "Trespass Decision") against Sprint. AR 670–78. It concluded that Sprint had

violated 43 C.F.R. § 2808.10, the regulation defining trespass, and 43 C.F.R. § 2806.36(b). AR

670–71. The Trespass Decision required Sprint to pay $86,931.96 for having its cellular cabinets

on the Site between 2003 and 2013. AR 674–75.

### 3.     Sprint's Administrative Appeal

In August 2013, Sprint paid its penalty under protest and appealed the decision to the

IBLA. AR 679–81, 683–84. The IBLA largely upheld the Trespass Decision as to the cellular

cabinets at issue in this case, rejecting nearly all of Sprint's arguments. *See Sprint Corporation*, 186 IBLA 132, 2015 WL 6074064 (Sept. 8, 2015) (the "IBLA Decision"). First, Sprint argued that its cellular cabinets are not "equipment shelters" within the meaning of the 2005 Regulation. *Id.* at 138. The Board rejected this argument because the cabinets "clearly house equipment" and therefore are "equipment shelter[s]." *Id.* at 139 (alteration in original). Sprint also argued that the 2008 Site Plan expressly authorized its cabinets. *Id.* But the Board disagreed, concluding that the text of the 2008 Site Plan "makes clear it is to be used in conjunction with instruments authorizing uses, but that it is not, itself, an authorization." *Id.* The Board also rejected Sprint's attempt to invoke the equitable estoppel doctrine against BLM, finding that "Sprint has not shown that BLM's actions constituted affirmative misconduct" and that "BLM is never barred by laches from enforcing public land laws." *Id.* at 141.

Having concluded that Sprint did trespass on federal land, the Board moved on to Sprint's argument that it was being double-charged for rent for its cellular cabinets, under two different rights-of-way. *Id.* at 140–41; *see* 43 C.F.R. § 2806.36 (describing under what circumstances BLM will charge tenants using a facility for rent). The Board also rejected this argument, concluding that BLM regulations require the agency to "charge[] rent to Crown for Crown's facility, including a portion of the rent attributable to its tenants," and, independently, to charge Sprint for "rent, under a separate authorization, for its use of the public lands." *Sprint*, 186 IBLA at 140 (citing 43 C.F.R. § 2806.36(a); *id.* § 2806.36(c)). As such, it concluded, "[t]his process of collecting fair market value for each tenant's use of public lands is required by regulation and does not constitute 'double rent.'" *Id.*

The Board reversed the Trespass Decision in one respect, concluding that it was improper for BLM to assess penalties against Sprint between 2003 and the date the 2005 Regulation was promulgated. *Id.* at 139–40. Neither party seeks review of that portion of the decision.

### 4. The Instant Action

On October 4, 2016, Sprint filed the instant action. It alleges, in a single cause of action, that the IBLA Decision violated the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.*, in several respects. *See* Compl. ¶¶ 79–82. Sprint has moved for summary judgment, raising many of the same arguments that it did before the IBLA. Pl.'s MSJ. Br. Sprint argues, for a number of reasons, that it did not trespass on BLM land. First, Sprint argues that its cellular cabinets are not "equipment shelters" within the meaning of the 2005 Regulation, such that it had to obtain a separate authorization for them. *Id.* at 20–25; Compl. ¶ 82(g). Second, Sprint argues that BLM repeatedly authorized Sprint to place its cabinets on the Site, and therefore BLM cannot pursue a trespass claim against it. Pl.'s MSJ Br. at 25–28; Compl. ¶ 82(b). And third, Sprint argues that BLM should be equitably estopped from pursuing trespass claims. Pl.'s MSJ Br. at 28–31; Compl. ¶ 82(c). Sprint also argues that Defendants exceeded their authority under the FLPMA to collect "fair market value" by assessing it two separate charges related to Sprint's use of the Site. Pl.'s MSJ Br. at 16–20; Compl. ¶ 82(a).

Defendants cross-moved for summary judgment. Defs.' MSJ Br. They argue that the cabinets are "equipment shelters," that BLM has not provided authorization for Sprint's cabinets, that equitable estoppel does not apply here, and that the IBLA correctly concluded that BLM's application of the 2005 Regulation does not run contrary to the FLPMA. *Id.*

## II. Legal Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). "In a case involving review of a final agency action under the APA, however, the standard set forth in Rule 56(a) does not apply because of the limited role of a court in reviewing the administrative record." *Jicarilla Apache Nation v. U.S. Dep't of the Interior*, 892 F. Supp. 2d 285, 289 (D.D.C. 2012), *aff'd per curiam*, 559 F. App'x 2 (D.C. Cir. 2014). "[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). "The 'entire case' on review is a question of law." *Id.* "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Ctr. for Food Safety v. Salazar*, 898 F. Supp. 2d 130, 138 (D.D.C. 2012) (citing *Richards v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977)).

Under the APA, a court must hold unlawful and set aside agency action, findings, and conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (C), (E). "The scope of judicial review under the arbitrary-and-capricious standard 'is narrow and a court is not to substitute its judgment for that of the agency,' but the court must confirm that the agency has fulfilled its duty to 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Ark Initiative v. Tidwell*, 816 F.3d 119, 127 (D.C. Cir.) (quoting *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) (internal quotation marks omitted), *cert. denied*, 137 S. Ct. 301 (2016). "Although the court 'may not supply a reasoned basis for the agency's action that the agency itself has not given,' the court 'will uphold

a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Butte Cty., Cal. v. Hogen*, 613 F.3d 190, 203 (D.C. Cir. 2010) (citations omitted) (quoting *SEC v. Chenery*, 332 U.S. 194, 196 (1947); *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).

**III.    Analysis**

The Court will address, in turn, Sprint's challenge to the IBLA's determinations that (1) Sprint trespassed on public land, and (2) the penalties assessed against Sprint do not exceed BLM's statutory authority. On both points, the Court concludes that summary judgment in favor of Defendants is warranted.

**A.    Sprint's Alleged Trespass**

Sprint challenges the IBLA's conclusion that it committed trespass on three grounds. First, Sprint argues that its cellular cabinets are not "equipment shelters" within the meaning of the 2005 Regulation. Second, it contends that even if it needed a separate right-of-way authorization, BLM did in fact repeatedly authorize it to place its cellular cabinets on the Site. Third, Sprint asserts that, in light of BLM's purported authorizations of the cabinets and the agency's delay in bringing the trespass action against it, the Court should invoke equitable estoppel against Defendants to find in its favor. The Court addresses each argument in turn.

**1.    Whether Sprint's Cellular Cabinets Are "Equipment Shelters" Under the 2005 Regulation**

The 2005 Regulation provides that "[i]f you own a[n] . . . equipment shelter . . . on public lands for communication purposes, you must have an authorization under this part, even if you are also a tenant or customer in someone else's facility." 43 C.F.R. § 2806.36(b). Sprint argues that the IBLA's conclusion that this regulation applies to Sprint's cellular cabinets is "erroneous[]"and "not supported by any evidence or reasoning" because its cellular cabinets are

not "equipment shelter[s]" but rather "pieces of equipment in themselves." Pl.'s MSJ Br. at 20–21; *see also id.* at 21 (citing AR 590, 626 (Photo D), 644–47 (photos of the cellular cabinets)). Defendants, for their part, argue that Sprint's cabinets are properly categorized as equipment shelters and that they should receive *Auer* deference for their interpretation of "equipment shelter" in the 2005 Regulation. Defs.' MSJ Br. at 9. The Court concludes Defendants have the better of the argument, whether or not *Auer* deference is appropriate.

Under the *Auer* doctrine, "an agency's interpretation of its own regulation is entitled to deference." *Christensen v. Harris Cty.*, 529 U.S. 576, 588 (2000) (citing *Auer v. Robbins*, 519 U.S. 452 (1997)). "*Auer* deference is warranted only when the language of the regulation is ambiguous." *Id.* Here, the Court does not conclude that the term "equipment shelter" in subsection (b) of the 2005 Regulation is ambiguous. A shelter is defined as "something that covers or affords protection [especially] from the elements." Webster's Third International Dictionary, 2093 (1986). This definition includes the cellular cabinets at issue here. Indeed, at oral argument, Sprint's counsel acknowledged that its cabinets store communications equipment. *See* Oral Arg. Tr. at 14:4–6 (The Court: "[The cabinets] do store equipment inside them. That's fair to say; right?" Counsel: "Right."). And photographs in the record show that the cabinets are large enough to easily "afford protection" to equipment. *See* AR 590, 626 (Photo D), 644–47. Moreover, neither party has pointed to any authority suggesting that the cabinets cannot be *both* equipment and "equipment shelters" under the 2005 Regulation. *See, e.g.*, Oral Arg. Tr. at 12:14–13:5. Thus, the IBLA's conclusion that Sprint's cellular cabinets "fall under the regulation's purview" because they "clearly house equipment" was not arbitrary and capricious, irrespective of whether it receives deference. *Sprint*, 186 IBLA at 139.

Nonetheless, both parties seem to assume that the term "equipment shelter" is in fact ambiguous. Certainly, that is Defendants' position. *See* Defs.' MSJ Br. at 9–10. And Sprint appears to suggest as much. *See* Pl.'s MSJ Br. at 20 (recognizing that "the IBLA acknowledged that the regulations do not specifically mention 'cabinets,' i.e., that they are ambiguous in that regard"). The Court concludes in the alternative that even if the term "equipment shelter" is ambiguous, Defendants' interpretation of that term to include Sprint's cellular cabinets would be entitled to *Auer* deference, and the Court would uphold it.

"When reviewing an agency's interpretation of its own regulation, we accord 'substantial deference to [that] interpretation,' giving it 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *Mellow Partners v. Comm'r*, 890 F.3d 1070, 1079 (D.C. Cir. 2018) (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)). A "plaintiff challenging an agency's interpretation of its own regulations carries a 'heavy burden in advancing [that] claim.'" *Freeman v. U. S. Dep't of the Interior*, 37 F. Supp. 3d 313, 329 (D.D.C. 2014) (alteration in original) (quoting *In re Polar Bear Endangered Species Act Listing & Section 4(d) Rule Litig.—MDL No. 1993*, 709 F.3d 1, 11 (D.C. Cir. 2013)). "'[The Court's] task is not to decide which among several competing interpretations best serves the regulatory purpose;' rather, '[it] must defer to the [agency's] interpretation unless an alternative reading is compelled by the regulation's plain language or by other indications of the [agency's] intent at the time of the regulation's promulgation.'" *Trinity Broad. of Fla., Inc. v. FCC*, 211 F.3d 618, 625 (D.C. Cir. 2000) (third and fourth alterations in original) (quoting *Thomas Jefferson Univ.*, 512 U.S. at 512).

Courts "typically consider three factors when deciding whether to apply *Auer* deference." *Mellow Partners*, 890 F.3d at 1079. "First, the language of the regulation in question must be

ambiguous, lest a substantively new rule be promulgated under the guise of interpretation."
*Drake v. FAA*, 291 F.3d 59, 68 (D.C. Cir. 2002) (citing *Christensen*, 529 U.S. at 588). "Second, there must be 'no reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question.'" *Id.* (quoting *Auer*, 519 U.S. at 462). "Finally, the agency's reading of its regulation must be fairly supported by the text of the regulation itself, so as to ensure that adequate notice of that interpretation is contained within the rule itself." *Id.* (citing *Auer*, 519 U.S. at 461).

For purposes of this analysis the Court assumes, pursuant to the first *Auer* factor, that the term "equipment shelter" is ambiguous. As for the second factor, the Court has "no reason to believe that the agency's interpretation 'does not reflect [its] fair and considered judgment on the matter.'" *Mellow Partners*, 890 F.3d at 1079–80 (alteration in original) (quoting *Auer*, 519 U.S. at 462). "In conducting this inquiry, [the Court] consider[s] whether the agency has 'ever adopted a different interpretation of the regulation or contradicted its position on appeal.'" *Drake*, 291 F.3d at 69 (quoting *Nat'l Wildlife Fed'n v. Browner*, 127 F.3d 1126, 1129 (D.C. Cir. 1997)). Sprint "has offered no relevant authority suggesting that [BLM] has ever wavered from its position." *Mellow Partners*, 890 F.3d at 1080. It points to no instance, for example, where BLM made a determination that cellular cabinets do not fall within the definition of an "equipment shelter" under the 2005 Regulation. Sprint does cite a few instances in the record where BLM employees surveying Sprint's cabinets referred to them as "equipment," not "equipment shelters." Pl.'s MSJ Br. at 21–22 (citing AR 626, 632, 643). But these notations in field reports are hardly "fair and considered" interpretations of the 2005 Regulation by BLM. And the IBLA's determination that Sprint's cabinets are "equipment shelters" does not, as Sprint suggests, represent a "180-degree policy turn." Pl.'s Reply at 7 (quoting *NRDC v. Hodel*, 618

F. Supp. 848, 876 (E.D. Cal. 1985)).  In fact, there is no evidence in the record of a BLM policy

in place suggesting that the 2005 Regulation did *not* cover cellular cabinets.[3]

Finally, under the third *Auer* factor, BLM's reading of the regulation is "fairly supported

by the text of the regulation itself."  *Drake*, 291 F.3d at 68.  As explained above, Sprint's cellular

cabinets are relatively large and, as it admits, store equipment.  Thus, the term "equipment

shelter" may fairly be read to include them.

Sprint offers a number of reasons why, in its view, BLM's interpretation of the 2005

Regulation is "plainly erroneous" or "inconsistent" with the text of the regulation and therefore

not entitled to *Auer* deference.  Pl.'s MSJ Br. at 24 (quoting *Auer*, 519 U.S. at 461); *see also id.*

at 20–25.  The Court finds them unpersuasive.  Sprint argues that the cabinets are "pieces of

equipment in themselves" and that Defendants never evaluated the "characteristics or functions"

of the cabinets.  *Id.* at 21.  But again, Sprint acknowledged at oral argument that the cabinets,

even if they are in some sense equipment themselves, also afford protection to equipment.  Oral

Arg. Tr. at 14:4–6.  And Sprint cites no reason why the cabinets cannot be *both* equipment and

equipment shelters under the regulation.  *Id.* at 13:3–5 (Counsel: "I think, in a general sense,

what you're saying is correct.  You could have something that falls within two regulatory

categories[.]").

Next, Sprint argues that the Sublease between Crown and Sprint refers to Sprint's

"equipment," not "equipment shelters."  Pl.'s MSJ Br. at 21.  But the fact that a contract between

two private parties used the word "equipment" says nothing about how the 2005 Regulation

---

[3] Similarly, Defendants argue that Sprint acknowledged in correspondence to BLM that its cabinets *were* equipment shelters.  *See* Defs.' Reply at 10 & n.3 (citing AR 723).  But like notes in BLM employees' field reports, these representations are of limited value, and are hardly dispositive on the matter.

should be interpreted by BLM. Similarly, Sprint points out that the Sublease had "Special Conditions" that included specifications for "cabinets." Pl.'s MSJ Br. at 21. But these "conditions" were part of a generic form outlining the standards for installing many different items at the Site ranging from connectors to antennas. *See* AR 977–90. The fact that "cabinets" are listed on the form says nothing about whether Sprint's cabinets are also "equipment shelters" under the regulation.

Lastly, Sprint cites a number of cases that, in its view, suggest that "equipment shelters" are often bigger than Sprint's cellular cabinets at issue and do not perform a technical function. *See* Pl.'s MSJ Br.. at 22–23. But none of these cases purport to interpret the 2005 Regulation or hold that the term "equipment shelter" cannot describe structures the size of the cabinets at issue here. *See W. Radio Servs. Co., Inc. v. Glickman*, 113 F.3d 966, 968 (9th Cir. 1997); *Cellular Tel. Co. v. Zoning Bd. of Adjustment*, 90 F. Supp. 2d 557, 563 (D.N.J. 2000); *Am. Cellular Network Co., LLC v. Upper Dublin Twp.*, 203 F. Supp. 2d 383, 385 (E.D. Pa. 2002)). And in any event, Defendants cite a number of cases where cabinets are in fact described as equipment shelters. Defs.' Reply at 7–8. In the end, these dueling authorities provide no basis to conclude that the IBLA's interpretation of the 2005 Regulation was "plainly erroneous." *Auer*, 519 U.S. at 461.

## 2.      BLM's Purported Authorization of the Cellular Cabinets

Next, Sprint argues that even if BLM had to authorize its cabinets, the administrative record demonstrates that it in fact did so. Pl.'s MSJ Br. at 25–28. Specifically, Sprint identifies four documents that it argues authorized the cabinets: (1) the 2003 Sublease between Crown and Sprint; (2) a 2004 "estoppel" letter that BLM signed for Crown stating that Crown was not in default under the Prime Lease; (3) the renewal of the Prime Lease between Crown and Sprint in December 2005; and (4) the 2008 Site Plan. *Id.* In Sprint's view, the IBLA Decision was "arbitrary and capricious, unsupported by substantial evidence, and premised on clear errors of

law and fact" because it failed to account for these authorizations. Pl.'s MSJ Br. at 28.[4] But none of these documents comes close to authorizing Sprint's cabinets. Thus, they provide no basis for this Court to set aside the IBLA decision.

First, the record is devoid of support for the proposition that Sprint properly sought, much less obtained, a BLM right-of-way authorization for the cabinets. The FLPMA requires an applicant seeking authorization from BLM to submit "plans, contracts, agreements, or other information reasonably related to the use, or intended use, of the right-of-way, including its effect on competition." 43 U.S.C. § 1761(b)(1). BLM regulations further specify what must be included in such an application, and direct applicants to file a Standard Form 299 ("SF-299"). *See* 43 C.F.R. § 2804.12. Sprint does not contest the government's assertion that it never submitted such a form for its cellular cabinets on the Site. Thus, it did not seek or obtain authorization for them as instructed by the statutory and regulatory framework.

Second, the documents on which Sprint relies do not materially undermine the IBLA's conclusion that BLM did not authorize its cellular cabinets. The first two documents Sprint identifies—the Sublease and the estoppel letter—clearly do not authorize its cabinets. The Sublease is a contract to which BLM was not even a party. In addition, the Sublease merely authorized Sprint to place antennas on Crown's tower and designated a "lease area" on the Site for Sprint's use. AR 962, 997. The Sublease does not specifically refer to Sprint's cabinets, nor

---

[4] It is not clear from the Joint Appendix submitted to the Court whether Sprint raised the first three of these purported authorizations before the IBLA, which only addressed the 2008 Site Plan in the IBLA Decision. *See Sprint*, 186 IBLA at 139. Nevertheless, even assuming they were raised, the Court concludes Sprint's arguments are without merit.

does it purport to grant Sprint its own right-of-way.[5]  Moreover, it does not appear that Crown

even had the authority to authorize the cabinets, since its subleasing authority was "subject to the

terms and conditions of the original ROW grant," "[a]ll applicable regulations in 43 CFR 2800,"

and "[s]tipulations agreed to by holder in the original ROW grant."  AR 366.  And nothing in

Crown's original grant suggests that it could have authorized Sprint's cabinets, which are also

not referenced therein.  *See* AR 59–60.  The estoppel letter fares no better as a purported

authorization.  BLM sent the estoppel letter to Crown, not Sprint, and the letter states only that

Crown was not in default under the Prime Lease.  *See* AR 413–16.  Like the Sublease, the

estoppel letter does not refer to or address the authorization of Sprint's cabinets at all.  Finally,

both the Sublease and the estoppel letter were executed *before* the 2005 Regulation was

promulgated, making it difficult to construe them as guaranteeing Sprint's compliance with a

regulation that did not yet exist.

The next document Sprint identifies —the 2005 renewal of the Prime Lease—also

provides it no help.  Sprint notes that the renewed lease, executed in December 2005, required

Crown to provide BLM with an annual inventory of customers and tenants.  Pl.'s MSJ Br. at 26

(citing AR 487).  Sprint also points out that the renewed lease required that "[a]ll . . . equipment

located [on] the property must be in accordance with stipulations in the communications site plan

approved by the authorized officer."  *Id.* (quoting AR 487).  In Sprint's view, these terms show

that BLM was aware of, and therefore authorized, the cellular cabinets.  The Court disagrees.

---

[5] As previously noted, Sprint points out that the Sublease had "Special Conditions" that included specifications for "cabinets."  Pl.'s MSJ Br. at 21.  But these "conditions" were part of a generic form outlining the standards for installing many different items at the Site ranging from connectors to antennas, as opposed to a specific authorization for Sprint's cabinets.  *See* AR 977-AR 990.

The 2005 renewal does not mention the cabinets, and as explained below, the "communications site plan"—the 2008 Site Plan—makes clear that it is not a substitute for an authorization.

Sprint also argues that its cabinets were listed on a table as "Authorized Facilities" in the 2008 Site Plan. Pl.'s MSJ Br. at 26–27; *see* AR 570. The 2008 Site Plan, however, is a general guidance document that by its own terms "must be used in conjunction with [a] granting authorization." AR 547. As such, it cannot provide the authorization that the 2005 Regulation requires. In fact, the 2008 Site Plan explicitly reemphasizes Sprint's obligation to submit a SF-229 to BLM to obtain an authorization. It states that "[t]enants . . . may not construct their own equipment shelter (building, shelter or cabinet)." AR 548. And "[i]f that is not possible, a separate SF-229 application . . . and authorization are required," which "will also result in the use being a tenant/customer of the original lease/holder in addition[] to being a separate facility for billing purposes."[6] *Id.* Finally, the table to which Sprint cites undermines its argument that the 2008 Site Plan authorized its cabinets. The table lists various structures and their authorization numbers—but the entry for Sprint's cabinets noticeably does not include any such number. *See* AR 570 (showing "Auth # NMNM xxxxxx" for "South Facility #4 Alamosa (Sprint)"). Thus, if anything, the table confirms that Sprint's cabinets were *not* authorized.

*          *          *

---

[6] In light of this language, Sprint argues that "the text of the [2008 Site Plan] is irrelevant to the interpretation of the 2005 Regulation" and that it "does not itself have any regulatory effect." Pl.'s Reply Br. at 6. But if so, the 2008 Site Plan could hardly have provided an authorization for Sprint's cabinets.

In short, the IBLA's conclusion that BLM did not authorize the placement of Sprint's cabinets on the Site is supported by more than substantial evidence, and there is no basis for the Court to set it aside.[7]

### 3. Equitable Estoppel

Sprint also argues that Defendants should be equitably estopped from finding Sprint in trespass due to "BLM's affirmative misconduct." Pl.'s MSJ Br. at 28–31. Specifically, Sprint argues that BLM's purported authorization of Sprint's cabinets and its delay in bringing the trespass action constitute affirmative misconduct that should absolve Sprint of any liability. *Id.* And it asserts that the IBLA's conclusion that BLM did not engage in affirmative misconduct— an element of equitable estoppel—was not supported "with any meaningful analysis." *Id.* at 30– 31. The Court disagrees.

"[A]lthough the [Supreme] Court has declined to hold that there are no circumstances in which estoppel may run against the government, it has made clear that the bar for succeeding on such a claim is high." *Millard Refrigerated Servs., Inc. v. Sec'y of Labor*, 718 F.3d 892, 897–98 (D.C. Cir. 2013) (citation omitted) (citing *OPM v. Richmond*, 496 U.S. 414, 421–23 (1990)). "A party attempting to apply equitable estoppel against the government must show that '(1) there was a definite representation to the party claiming estoppel, (2) the party relied on its adversary's conduct in such a manner as to change his position for the worse, (3) the party's reliance was reasonable[,] and (4) the government engaged in affirmative misconduct.'" *Keating v. FERC*,

---

[7] In a footnote, Sprint argues that the IBLA Decision was arbitrary and capricious because BLM failed to submit the 2008 Site Plan in the proceedings below. Pl.'s MSJ at 27 n.2. The Court "need not address an argument raised only cursorily in a footnote." *Armstrong v. Geithner*, 608 F.3d 854, 857 n.** (D.C. Cir. 2010). Moreover, the IBLA discussed the 2008 Site Plan in its Decision, so it was in fact submitted and considered below. *Sprint*, 186 IBLA at 139.

569 F.3d 427, 434 (D.C. Cir. 2009) (alteration in original) (quoting *Morris Commc'ns, Inc. v. FCC*, 566 F.3d 184, 191–92 (D.C. Cir. 2009)).

The IBLA rested its decision on the fourth prong, concluding that Sprint had failed to show "that BLM's actions constituted affirmative misconduct, a requirement for invoking equitable estoppel." *Sprint*, 186 IBLA at 141 (citing *Ron Coleman Mining, Inc.*, 172 IBLA 387, 391 (2007)). Relatedly, it concluded that BLM is "never barred by laches from enforcing public land laws." *Id.* (citing 43 C.F.R. § 1810.3(a)).

There is no basis in the record for the Court to disturb the IBLA's conclusion. Sprint argues that BLM engaged in "affirmative misconduct" because it knew about Sprint's cabinets as early as 2005 but did not initiate trespass proceedings until 2013. Pl.'s MSJ Br. at 30 (citing AR 430). But "[e]stoppel generally requires that government agents engage—by commission or omission—in conduct that can be characterized as misrepresentation or concealment, or, at least, behave in ways that have or will cause an egregiously unfair result." *Pierce v. SEC*, 786 F.3d 1027, 1038 (D.C. Cir. 2015) (quoting *GAO v. Gen. Accounting Office Pers. Appeals Bd.*, 698 F.2d 516, 526 (D.C. Cir. 1983)). Sprint points to no "misrepresentation or concealment" by the agency. And the mere delay by BLM does not constitute affirmative misconduct. "[A]s a general rule, laches or neglect of duty on the part of officers of the government is no defense to a suit by it to enforce a public right or protect a public interest." *United States v. Philip Morris Inc.*, 300 F. Supp. 2d 61, 72 (D.D.C. 2004) (quoting *Utah Power & Light Co. v. United States*, 243 U.S. 389, 409 (1917)); *see also* 43 C.F.R. § 1810.3(a) ("The authority of the United States to enforce a public right . . . is not vitiated or lost by acquiescence of its officers or agents, or by their laches, neglect of duty, failure to act, or delays."); *United States v. Summerlin*, 310 U.S. 414, 416 (1940) ("It is well settled that the United States is not . . . subject to the defense of

laches in enforcing its rights."); *Ill. Cent. R.R. Co. v. Rogers*, 253 F.2d 349, 353 (D.C. Cir. 1958)

("No rule is better established than that the United States are not bound by limitations or barred

by laches where they are asserting a public right." (quoting *Societe Suisse Pour Valeurs de

Metaux v. Cummings*, 99 F.2d 387, 395 (D.C. Cir. 1938)). Thus, BLM's alleged delay in issuing

the Trespass Notice was not "affirmative misconduct," and Sprint has failed to meet the "high"

bar for establishing equitable estoppel against the government. *Millard Refrigerated*, 718 F.3d at

897–98 (quoting *Richmond*, 496 U.S. at 421–22). Therefore, the Court has little trouble

concluding that the IBLA Decision was not arbitrary and capricious in concluding Sprint was not

entitled to equitable estoppel.[8]

### B. BLM's Statutory Authority to Assess the Penalties Against Sprint

Finally, Sprint argues that, even if its cellular cabinets constitute an illegal trespass, BLM

exceeded its authority under the FLPMA in assessing penalties against it. Pl.'s MSJ Br. at 16–

20. The FLPMA provides that "[t]he holder of a right-of-way shall pay in advance the fair

market value thereof, as determined by the Secretary granting, issuing, or renewing such right-

of-way." 43 U.S.C. § 1764(g). Relying on this provision, Sprint argues that BLM exceeded its

statutory authority because Sprint was charged for both rent as Crown's tenant and for Sprint's

own separate right-of-way authorizing its cellular cabinets. In Sprint's view, these charges,

---

[8] Sprint asserts that the IBLA decision "does not contest that (1) BLM made representations to Sprint, (2) Sprint relied on those representations to its detriment, and (3) Sprint's reliance was reasonable." Pl.'s MSJ Br. at 30. But the IBLA's "silence does not imply that [Sprint] would be any more successful on those elements." *Keating*, 569 F.3d at 434 & n.1. Indeed, as explained above, the purported BLM representations Sprint cites—(1) BLM's authorization allowing Crown to sublease; (2) the Sublease between Crown and Sprint; (3) the estoppel letter that BLM provided to Crown; (4) the 2005 renewed lease between BLM and Crown; and (5) the 2008 Site Plan, Pl.'s MSJ Br. at 29—were hardly "definite representation[s]" *to Sprint* that its cellular cabinets were authorized on the Site. *Id.*

taken together, violate the statute because they require it to pay more than "fair market value" for

its use of the Site. *See* Pl.'s MSJ Br. at 3.

Significantly, however, Sprint does not challenge the individual formulas through which

BLM calculated the "fair market value" of (1) Crown's right-of-way (and the portion passed on

to Sprint as a tower tenant), and (2) Sprint's own right-of-way authorizing its cabinets. *See* Pl.'s

MSJ Br. at 16–20; *see also* Defs.' Reply at 3–5 & n.1 (describing how BLM calculated rent for

each of the Site uses). Therefore, its argument is based solely on the fact that it was charged two

separate fees for them. In Sprint's view, BLM is "collecting two rental payments totaling more

than fair market value for the same use of the . . . Site." Pl.'s MSJ Br. at 16 (emphasis removed).

But in Defendants' view, Sprint is being charged for "fundamentally different uses" of the Site,

both of which are authorized by BLM regulations. Defs.' MSJ Br. at 21–23 (citing 43 C.F.R.

§ 2806.36(a)–(c)).[9]

On the record before it, the Court cannot conclude that BLM exceeded its statutory

authority simply by requiring Sprint to pay two separate fees in connection with these two

separate rights-of-way. Each fee is associated with a separate and distinct right to use federal

land, for which the FLPMA requires BLM to charge fair market value.[10] First, pursuant to the

Sublease, Sprint paid rent to Crown for its right to install four specifically-described antennas on

---

[9] Defendants do not argue that their interpretation of the FLPMA is entitled to *Chevron*
deference, so the Court need not undertake such an analysis. *Cf. SSC Mystic Operating Co., LLC
v. NLRB*, 801 F.3d 302, 316 (D.C. Cir. 2015) (Srinivasan, J., concurring) ("Why walk through
*Chevron's* two-step deference framework in the opinion if the Board made no claim of
entitlement to *Chevron* deference in the first place?").

[10] In its reply brief, Sprint argues that Defendants did not respond to its fair market value
argument and therefore the Court should consider it conceded. Pl.'s Reply at 1–4. But
Defendants did, albeit briefly. Defs.' MSJ Br. at 21–23. Thus, it was not conceded.

Crown's tower, and for Crown to designate a "lease area" for Sprint. AR 962, 997. Crown kept

a portion of this rent and passed another portion on to BLM. AR 963; Pl.'s MSJ Br. at 8 (citing

AR 405, 403, 410, 446, 517, 527, 592, 597, 602, 605, 607). And second, by enacting the 2005

Regulation and interpreting it to cover cellular cabinets, BLM determined that Sprint was

required to make a second set of payments for a right-of-way to install its cabinets.[11]

Sprint's argument is predicated on its contention that prior to being required to pay for its

own right-of-way to install its cabinets, it was *already* paying fair market value for its *entire* use

of the Site pursuant to the Sublease (and Crown's right-of-way), such that requiring it to pay an

additional fee violated the FLPMA. But on the present record, where Sprint has not challenged

the various formulas used by BLM to calculate fair market value, the Court simply has no basis

to agree. By promulgating the 2005 Regulation and interpreting it to include cellular cabinets,

BLM effectively concluded that the fair market value of installing Sprint's cabinets on public

land had *not* been adequately captured by the rent Sprint had been paying in connection with

Crown's right-of-way.[12] In other words, it determined that Sprint had *not* been paying fair

---

[11] Sprint also argues Defendants' actions were arbitrary and capricious because the Trespass
Decision charged Sprint for its full use of the Site when only its cabinets (and not its other
equipment) were in violation of the 2005 Regulation. Pl.'s MSJ Br. at 19-20. But as Sprint
conceded at oral argument, it did not raise this argument before the IBLA. Oral Arg. Tr. at 10:7–
11:5. Thus, the Court does not consider it. *See Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d
1251, 1297 (D.C. Cir. 2004) (per curiam) ("It is a hard and fast rule of administrative law, rooted
in simple fairness, that issues not raised before an agency are waived and will not be considered
by a court on review." (citing *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37
(1952))).

[12] Nothing in the Sublease is inconsistent with this conclusion. As described above, the Sublease
merely authorized Sprint to place antennas on Crown's tower and designated a "lease area" on
the Site for Sprint's use. AR 962, 997. The Sublease does not specifically refer to Sprint's
cabinets, nor does it purport to grant Sprint its own right-of-way authorizing them. Moreover,
the Sublease specifically allows for the possibility that Sprint might have to pay additional fees
for its use of the Site by requiring it to use the Site "in compliance with all applicable . . .

market value for its *entire* use of the Site. Whatever the merits of that determination, the record here simply provides no basis for the Court to second-guess it.

Therefore, the Court cannot conclude that BLM exceeded its statutory authority under the FLPMA merely by requiring Sprint to pay two separate fees in connection with these two separate rights-of-way.

## IV. Conclusion

For all of the above reasons, in a separate Order, Defendants' Motion for Summary Judgment (ECF No. 24) will be granted and Sprint's Motion for Summary Judgment (ECF No. 23) will be denied.


/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: December 20, 2018

---

regulations . . . of any governmental bodies and administrative agencies" and "obtain, at its own expense, any and all necessary licenses or permits . . . from such governmental authorities as shall have jurisdiction in connection with the construction, installation, operation, repair, alteration, or replacement of [its] equipment or with any of its activities thereon." AR 965.